**UNITED STATES of America, Plaintiff,**

v.

**Ervin Junius THORNTON II, Defendant.**

**No. Crim. 97–50021–01.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 1, 1998.

Saul Green, United States Attorney, Mark C. Jones, Assistant United States Attorney, Flint, MI, for Plaintiff.

William W. Swor, Detroit, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS OUT OF COURT STATEMENT

GADOLA, District Judge.

Defendant Ervin Junius Thornton II has filed a motion to suppress his alleged out of court statements made to a law enforcement officer. Defendant argues that these statements should be suppressed at trial due to a violation of his Fifth and Sixth Amendment rights. On July 23, 24 and August 18, 1998, this Court held an evidentiary hearing on defendant's motion to suppress. For the reasons set forth below, this Court will deny defendant's motion to suppress out of court statements.

### FACTUAL BACKGROUND

On September 21, 1995, Lee Davis Strickland, his sister, Fanny Strickland, and one Eric Williams exited the restaurant owned by Mr. Strickland and entered into Mr. Strickland's automobile. At that moment at least two individuals approached from the side of the building and fired numerous times into the car, killing Strickland and his sister. *See* Testimony of Lt. Koger, Detention Hearing held on May 27, 1997, p. 6. Eric Williams was wounded but survived the shooting. The weapon used was later determined to be a nine millimeter handgun. There is some testimony that the homicides were motivated by Strickland's indictment in a drug-related matter, specifically, by the fear that Strickland would implicate others and assist prosecution. *See* Testimony of Lt. Koger, Detention Hearing held on May 27, 1997, p. 8.

On May 21, 1997, a grand jury of the United States District Court for the Eastern District of Michigan issued an eight-count indictment charging defendant Thornton with the following crimes: one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846, one count of conspiracy to commit firearm murder during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(j) and 924(c), two counts of firearm murder during or in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(j)(1), one count of use of a firearm during and in relation to a felony drug offense in violation of 18 U.S.C. § 924(c), one count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), two counts of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and two counts of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1).

On May 22, 1997, search warrants were executed at several locations in and around Flint, Michigan, allegedly associated with defendant Thornton and co-defendant Tederick Lemair Jones. These locations included 4220 Boulder Drive, 4115 Dort Highway, 1901 W. Home Street, 3717 Race Street, 2109 Chateau, 5209 Drummond Square and 3510 Trumbull Avenue. From under the seat in a van parked in front of the residence located at 1901 W. Home Street, police seized a red plastic bag containing a nine-millimeter hand gun. *See* Testimony of Lt. Koger, Detention Hearing held on June 13, 1997, p. 9. At that location, police also found black clothing allegedly belonging to defendant. *See* Testimony of Lt. Koger, Evidentiary Hearing held on July 28, 1998. Police also seized, from various locations, narcotics, some rounds of ammunition, another firearm, drug paraphernelia, phone bills, and other assorted business papers belonging to defendant Thornton. *See* Testimony of Lt. Koger, Detention Hearing held on June 13, 1997, p. 5–6.

On the same day, May 22, 1997, Thornton was arrested pursuant to the above-mentioned indictment and transported to the Flint Police Station Headquarters. While in custody, defendant Thornton allegedly made inculpatory statements in the presence of Lieutenant (now Captain) Jerome Koger and Officer Cedric Kendall. To be analytically

precise, there were three separate statements allegedly made to law enforcement officers on May 22, 1997. First, defendant allegedly stated to Lt. Koger, at the Flint Police Station Headquarters, "I might as well tell you what happened because you have the clothes I wore and the gun I used to do the shooting." Second, in the parking lot of the United States Courthouse, defendant purportedly remarked to Officer Kendall, "Man, they are going to kill me if I tell it. You don't know those guys, they will kill me." According to Kendall's testimony at the evidentiary hearing, Kendall then asked defendant if he wanted to talk to Lt. Koger, whereupon defendant answered, "Yeah." Third, in the interview room at the United States Courthouse, after defendant had spoken with Attorney Isaac, Lt. Koger re-entered the interview room and defendant allegedly initiated a conversation by asking, "So, what would you like to talk about first?" According to Lt. Koger's testimony, defendant then proceeded to make inculpatory statements.

The Court will now provide a capsule summary of the testimony elicited from Lt. Jerome Koger, Officer Cedric Kendall and Attorney Roger Isaac at the evidentiary hearing in the above-entitled matter held on July 23, 24 and August 18, 1998.

### LT. JEROME KOGER'S TESTIMONY

Lieutenant (now Captain) Jerome Koger testified at the evidentiary hearing that he went to the Flint Police Station Headquarters after assisting in the execution of search warrants, including one at Thornton's residence, 4220 Boulder Drive. Koger further testified that he found Thornton in the Captain's office. He read Thornton his Miranda rights. When Koger asked Thornton if he wished to waive his right to an attorney, Thornton told Koger that he wanted to speak to Koger concerning the case, but that he first wished to speak with Attorney Isaac. Koger immediately called Isaac and asked him to come to the United States Courthouse to meet with Thornton. Isaac, although initially reluctant, eventually agreed to come to the United States Courthouse to meet with Thornton.

According to Koger's testimony, the defendant then abruptly stated to Koger, before being transported from Flint Police Headquarters to the courthouse, and without any inquiry or prompting by Koger, that "I might as well tell you what happened because you have the clothes I wore and the gun I used to do the shooting." Koger was "amazed" that Thornton had said this. Koger testified that he did not know at that time that these items had been seized by other police officers.

Koger testified that he later went to the United States Courthouse, after Thornton had been transported to that location. Upon his arrival, Koger learned that Thornton was meeting with Mr. Isaac. Koger knocked on the door to the interview room in which Issac and Thornton were meeting. When Koger entered the room, Thornton immediately started to speak to Koger, but Isaac instructed him to cease speaking.

Thereafter, Koger and Isaac talked outside of Thornton's presence. Isaac allegedly told Koger that Thornton could not afford to hire Isaac and that it was up to Thornton to decide what to do, i.e., whether or not to speak with Lt. Koger. Issac also told Koger that a federal defender should be appointed. Isaac, at no time, gave Koger "permission" to speak with Thornton.

Koger further testified that after speaking with Isaac, he went back into the interview room. Thornton then allegedly initiated a conversation with Koger, in the absence of any inquiry or comment whatsoever from the police lieutenant, specifically asking, "So, what would you like to talk about first?" Koger then responded that he would like to talk about the homicides first. Thornton then allegedly gave a statement. According to Koger's testimony, Thornton's statement included the following assertions: that he had been paid $10,000 by Jewell Lamont Allen and Tederick Jones for the murder of David Strickland; that the reason for the murder was that Strickland had been indicted and Jewell Lamont Allen was afraid he would talk; that the weapon he used was a nine-millimeter and that Tederick Jones ("Teddy") conducted surveillance during the murders; that the clothing he wore was a black "ninja-outfit;" that he was involved in

drug trafficking; and that he had purchased drugs from Allen.

## OFFICER CEDRIC KENDALL'S TESTIMONY

Officer Cedric A. Kendall testified that on May 22, 1997, he and another officer transported Thornton from Flint Police Station Headquarters to the United States Courthouse. In the parking lot of the courthouse, while Thornton was in custody and being taken to the United States Marshals' Lockup Facility, Thornton allegedly said to Kendall, "Man, they are going to kill me if I tell it! You don't know those guys, they will kill me!" Kendall then asked Thornton if he wanted to talk to Koger. According to Kendall's testimony, Thornton then responded, "Yeah."

## TESTIMONY OF ATTORNEY ROGER G. ISAAC

Roger G. Isaac is an attorney who had represented defendant Thornton in four "fairly serious" drug cases in state court. Isaac testified that on May 22, 1997, he received a telephone call from Lt. Koger. Koger told Isaac that Thornton had requested to speak with him and Koger asked Isaac if he would do so. Isaac initially said that his schedule did not permit him to meet with Thornton, but Isaac later agreed to meet with Thornton. Koger indicated that he wanted a statement from Thornton before "word got out on the street" that Thornton was in custody, and that Thornton had requested the opportunity to speak with Isaac prior to giving any statement.

Isaac came to the United States Courthouse with an appearance in hand to be utilized in the event that Thornton requested Isaac to represent him and Isaac elected to do so. Upon arriving at the courthouse, Isaac learned of the charges filed against Thornton. He then met with Thornton in an interview room located in the United States Marshals' Lockup Facility. Isaac advised Thornton as to the amount of his fee and Thornton indicated to Isaac that he was shocked by the stated amount of the attorney's fee. Isaac then purportedly told Thornton that Thornton could not afford to hire him and that Thornton should obtain an attorney from the Federal Defender's Office to represent him.

Isaac characterized Thornton as confused and scared, and that he felt "pressured" by the police to give a statement. Isaac testified that Thornton indicated that he did not know whether or not he should speak to Koger. Isaac told Thornton that since he was not representing him, he would not help Thornton with that decision and that the decision was Thornton's to make. Isaac, however, told Thornton that he should be represented by a court-appointed lawyer, an attorney from the Federal Defender's Office.

Isaac further testified that he spoke with Thornton for approximately 15 minutes. Before leaving the courthouse, Isaac also spoke with Lt. Koger. Isaac testified that he told Koger that he would not be representing Thornton, and that Thornton should have an attorney appointed for him from the Federal Defender's Office. Isaac further testified that he did not give Lt. Koger permission to talk to Thornton since he was not representing Thornton and therefore had no authority to do so.

Isaac also testified that Paragraph 7 of his affidavit, which was previously submitted by Thornton's defense counsel in support of the motion to suppress defendant's statements, was "not entirely accurate." In his affidavit, Attorney Issac had stated that he told Lt. Koger at the United States Courthouse that Thornton did not want to speak to Lt. Koger unless an attorney was present. Mr. Isaac in his testimony, however, clarified his statement in the affidavit. Isaac testified that he was uncertain as to whether Thornton had actually made such a statement to him which he then reiterated to Lt. Koger, or whether instead he (Isaac) had merely told Lt. Koger that Thornton needed to have an attorney.

Attorney Isaac further testified that the defendant had previously been involved in *four* "fairly serious" drug cases in state court.

## LEGAL STANDARDS FOR REVIEWING ADMISSIBILITY OF STATEMENTS

The Fifth Amendment requires that the police employ certain "procedural

safeguards" during "custodial interrogation" to protect against violation of a suspect's privilege against compelled self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602. A defendant may waive his *Miranda* right to counsel and his right to remain silent, provided that such waiver is made voluntarily, knowingly and intelligently. *Id.*

■ The Sixth Amendment has a different locus of operation and is "offense-specific." It attaches only at or after "a critical stage" is reached in the criminal prosecution. *See U.S. v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). This means that the Sixth Amendment right to counsel attaches at or after judicial proceedings have been initiated against a defendant, " 'whether by way of formal charge, preliminary hearing, *indictment,* information, or arraignment.' " *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (emphasis added), *quoting Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

■ Thus the Fifth Amendment right to counsel is more broad than the Sixth Amendment right. Once invoked, the Fifth Amendment extends to any subsequent custodial interrogation, "regardless of whether that questioning pertains to matters wholly unrelated to the crime with regard to which the right was invoked." *People v. Crusoe,* 433 Mich. 666, 689, 449 N.W.2d 641 (1989). The Sixth Amendment right, on the other hand, is more narrow, and is limited to specific crimes for which the government has begun prosecution. In addition, the Sixth Amendment right applies even in the absence of custody. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *see also State v. Dictado,* 102 Wash.2d 277, 687 P.2d 172 (1984).

■ In the case at bar, all statements were made at a time *after* defendant had been indicted for the following crimes: one count of conspiracy to distribute controlled substances, one count of conspiracy to commit firearm murder during and in relation to a drug trafficking crime, two counts of firearm murder during or in relation to a drug trafficking crime, one count of use of a firearm during and in relation to a felony drug offense, one count of distribution of cocaine, two counts of possession with intent to distribute cocaine, and two counts of possession with intent to distribute marijuana. Therefore, at least with respect to questioning related to the above-enumerated charges, defendant's Sixth Amendment right to counsel had attached.

■ Although the government argues that defendant's request for counsel was ambiguous and therefore defendant's right to counsel was not triggered, this Court finds that defendant did invoke his right to counsel for purposes of both the Fifth Amendment and the Sixth Amendment. From the testimony of Lt. (now Capt.) Koger, it is clear that defendant stated that he was willing to speak with police, but that he wished first to speak with Attorney Isaac.

■ The request for counsel in the instant case is unambiguous in the sense that defendant clearly made known his desire to speak with an attorney who had previously represented him with regard to other matters. The fact that defendant indicated a desire to speak to police eventually does not detract from the validity of the request. As the Court stated in *Miranda* itself, "[i]f [defendant] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no [further] questioning." *Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602. The Court continued, "[It]he mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445, 86 S.Ct. 1602.

## THE FIRST STATEMENT AT FLINT POLICE DEPARTMENT

██ With respect to the first statement, after defendant was given his *Miranda* rights, defendant abruptly stated, with no prompting from police, "I might as well tell you what happened because you have the clothes I wore and the gun I used to do the shooting." Koger testified that this statement "amazed" him because Koger was not aware that a search of defendant's home and vehicle had turned up a weapon or clothes.

Analyzing the statement under the Fifth Amendment, it is clear that defendant was in custody at the time the statement was made. The issue then becomes whether defendant was undergoing interrogation when he made the statement. It is clear from Koger's testimony that the police lieutenant immediately telephoned Mr. Isaac. Koger then persuaded the attorney to come to the federal courthouse to consult with defendant. After the telephone call, and at some point before being transported to the U.S. Courthouse, defendant unexpectedly volunteered the inculpatory statement to Lt. Koger, in the absence of any inquiry or interrogation or comment on the part of Lt. Koger.

██ Lt. Koger scrupulously honored defendant's request for counsel and ceased questioning defendant after defendant's request for Attorney Isaac. Since Koger had stopped questioning defendant, as he was required to do under *Miranda*, there was no interrogation at the time the statement was made. The Fifth Amendment right to counsel does not protect a defendant under such a situation. It has been settled that a volunteered statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings.

*See State v. Williams,* 535 N.W.2d 277, 289) (Minn.1995) (*citing United States v. Lawrence,* 952 F.2d 1034, 1036 (8th Cir.1992) cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434); *see also Miranda,* 384 U.S. at 478, 86 S.Ct. 1602.[1]

██ Assuming *arguendo* that this statement were a product of a "custodial interrogation," a suspect may waive his Fifth Amendment rights, if such waiver is made "voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The question of whether defendant has waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The Supreme Court has held that the determination as to whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation. *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (*citing Miranda v. Arizona,* 384 U.S. at 475–477, 86 S.Ct. 1602).

██ Applying the "totality of circumstances" test to the instant case, the Court may take into account the age, experience, education, background, and intelligence of the accused, in determining whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *Id.* (*citing North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). Taking into account these factors, defendant's decision to speak was made knowingly and intelligently in light of defen-

---

1. In the *Miranda* decision itself, the Supreme Court acknowledged that its opinion did not affect the admissibility of volunteered statements:

 In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the

police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. *Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not, affected by our holding today.* *Miranda,* 384 U.S. at 478 (emphasis added).

dant's prior extensive experience with the criminal justice system and in light of the recently given *Miranda* warnings. The fact that these warnings were understood and appreciated by defendant is further supported by the fact that defendant expressed a desire to speak with counsel before speaking with police. The remaining issue is whether defendant's waiver was "voluntary."

With respect to the voluntariness issue, at a later time after defendant had been transported to the U.S. Courthouse, there is some testimony by Attorney Isaac that defendant appeared "scared and confused," and that Isaac felt badly for defendant upon leaving the courthouse. Isaac testified that defendant felt "pressured" by the police to make a statement. In characterizing Lt. Koger's style of interrogation, however, Isaac stated that Koger is "not a rubber hose type of guy; he does not use a threatening manner."

Although Isaac's anecdotal testimony regarding defendant's state of mind might appear to militate against a finding of waiver, I do not find Isaac's observations to be concrete or specific enough to allow the conclusion that defendant's waiver of his rights was involuntary. There is no evidence that defendant was coerced, intimidated, bullied, threatened or subjected to any form of deceptive tactic designed to trick defendant into speaking. *See Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception..... [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"). The conclusion that defendant's waiver was voluntary is further supported by the testimony of Isaac, regarding Lt. Koger's style of interrogation, that Koger was not a "rubber hose type of guy" and that "he does not use a threatening manner." After reviewing the totality of the circumstances surrounding defendant's waiver, it is clear that defendant voluntarily, knowingly and intelligently waived his Fifth Amendment rights. I therefore find no Fifth Amendment violation.

Analyzing the statement under the Sixth Amendment, defendant had previously requested counsel after an indictment. Therefore, the Sixth Amendment right to counsel had attached. Statements made by defendants in violation of their Sixth Amendment right to counsel must be suppressed at trial. *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Under the rule articulated in *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), *"if police initiate interrogation* after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636, 106 S.Ct. 1404 (emphasis added).

In the instant case, the first statement made to Lt. Koger at the Flint Police Department was made at a point in time *after* Lt. Koger had ceased his questioning of defendant. Nevertheless, the Sixth Amendment right to counsel had attached and therefore any waiver of that right during any police-initiated interrogation would be invalid. But here defendant was not responding to any interrogation on the part of the police. The police-initiated interrogation had ceased and defendant was going to be transported to the United States Courthouse. The Sixth Amendment right to counsel applies to "adversarial judicial proceedings" and "police-initiated interrogations." *See id.; see also Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The *Michigan v. Jackson* rule explicitly states that it applies "if police initiate interrogation...." *Id.*

The Supreme Court has interpreted the *Michigan v. Jackson* rule as *not* constituting a blanket invalidation on all waivers made by defendants of their Sixth Amendment rights. The Supreme Court in *Michigan v. Harvey* clearly stated:

> Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to

counsel once it is invoked would be "to imprison a man in his privileges and call it the Constitution." This we decline to do. *Michigan v. Harvey,* 494 U.S. 344, 353, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (*quoting Adams v. United States ex rel. McCann,* 317 U.S. 269, 280, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). The *Harvey* Court characterized the *Jackson* rule as prophylactic, rendering otherwise valid waivers invalid when they result from police-initiated interrogation. *Id.* The shield of the prophylactic rule should not be allowed to be "perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.* (*quoting Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)).

Since the *Michigan v. Jackson* rule invalidating waiver is inapplicable because the police did not initiate further responses from defendant, defendant *may validly waive* his Sixth Amendment right to counsel. The issue thus becomes whether defendant did in fact waive that important right. Waiver of the right is valid only when it reflects "an intentional relinquishment or abandonment of a known right or privilege." *Patterson v. Illinois,* 487 U.S. 285, 292, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (*quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The court reviewing a claim of waiver should "indulge every reasonable presumption against waiver." *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. 1019. The burden of proof rests on the government to show a valid waiver. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). There need not be, however, an explicit statement of waiver by the defendant. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

The Supreme Court in *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), explicitly rejected the notion that the Sixth Amendment is more difficult to waive than the Fifth Amendment in the context of post-indictment questioning. 487 U.S. at 297–98, 108 S.Ct. 2389. The Court stated that "it is our view that whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of post-indictment questioning." *Id.* at 298, 108 S.Ct. 2389. In the *Patterson* case, *Miranda* warnings and waiver of Fifth Amendment rights were sufficient to make defendant aware of his Sixth Amendment right to counsel during post-indictment questioning. *Id.* The Supreme Court held that an accused who has received *Miranda* warnings has been "sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Id.* at 296, 108 S.Ct. 2389; *see also Bryant v. State,* 314 Ark. 130, 862 S.W.2d 215, 221 (1993).[2]

Applying the *Patterson* rule to the case at bar, defendant knowingly and intelligently waived his Sixth Amendment right to counsel because he had been given *Miranda* warnings, which sufficiently apprised him of his Sixth Amendment right to counsel. In the post-indictment context, it is settled that defendant's waiver of *Miranda* rights suffices to waive his Sixth Amendment right to counsel as well. *Id.* at 296, 108 S.Ct. 2389; *see also Bryant v. State,* 314 Ark. 130, 862 S.W.2d 215, 221–22 (1993). In fact, defendant was so aware of the importance of counsel that he asked to speak with Attorney Isaac before speaking with Lt. Koger. The fact that defendant volunteered statements subsequent to that request further supports the waiver argument.

The statement at Flint Police Headquarters which defendant unexpectedly volunteered to Lt. Koger, to Koger's amazement, and which was not made in response to inter-

---

**2.** The *Patterson* Court specifically grounded its opinion in the relatively "simple and limited" role of counsel during post-indictment questioning:

Because the role of counsel at questioning is relatively simple and limited, we see no problem in having a waiver procedure at that stage which is likewise simple and limited. So long

as the accused is made aware of the "dangers and disadvantages of self-representation" during postindictment questioning, by use of the Miranda warnings, his waiver of his Sixth Amendment right to counsel at such questioning is "knowing and intelligent." *Patterson,* 487 U.S. at 300, 108 S.Ct. 2389.

rogation, after Koger at defendant's request had arranged to have Attorney Isaac come to meet defendant at the U.S. Courthouse (i.e., "I might as well tell you what happened because you have the clothes I wore and the gun I used to do the shooting") is thus admissible. This Court finds no Fifth Amendment or Sixth Amendment violation.

### THE SECOND STATEMENT AT COURTHOUSE PARKING LOT

With respect to the second statement made to Officer Kendall, defendant remarked, "Man, they are going to kill me if I tell. You don't know those guys; they will kill me." Kendall then asked defendant if he wanted to talk to Lt. Koger. Defendant answered, "Yeah." Officer Kendall testified that he did not attempt to interview defendant. The police officer did not initiate conversation with defendant nor prompt defendant to make the mumbled remark.

Analyzing the statement under the Fifth Amendment, defendant was in custody during his transport from the Flint Police Department to the U.S. Courthouse. Defendant, however, was not under interrogation by Officer Kendall or the officer assisting in the transport. Also, this situation cannot be construed as part of the earlier interview with Lt. Koger. It was separated in terms of both time and location, and Officer Kendall was not present and had no knowledge regarding the earlier interview. "Interrogation" under *Miranda* has been held to refer not only "to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (stating that "[i]nterrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.") In this situation, there is no testimony or evidence to support the conclusion that defendant was subjected to interrogation or "its functional equivalent," i.e., words or action on the part of the police

reasonably likely to elicit an incriminating response. *Id.* at 300, 100 S.Ct. 1682. Since defendant was not being interrogated, defendant's statement is not barred by the Fifth Amendment. It is settled that "a volunteered statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." *State v. Williams,* 535 N.W.2d 277, 289) (Minn.1995) (*citing United States v. Lawrence,* 952 F.2d 1034, 1036 (8th Cir.1992), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434).

This Court therefore finds no Fifth Amendment violation.

Analyzing the statement under the Sixth Amendment, although it was made after indictment and request for counsel, the statement was *not* the product of any police-initiated interrogation. Just as with the first statement discussed above, the issue thus becomes whether defendant *waived* his Sixth Amendment right to counsel by initiating an exchange with Officer Kendall during transport to the United States Courthouse.

Since it had only been a short time since Lt. Koger had provided defendant with his *Miranda* warnings, this Court concludes that defendant was aware of his Sixth Amendment right to counsel. *Patterson,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261. There is no evidence of coercion or intimidation attendant to Officer Kendall's transport of the defendant. There is nothing in the record to suggest defendant's statement was made involuntarily. Defendant's decision to speak was made knowingly and intelligently, in light of the *Miranda* warnings given at the Flint Police Station and in light of defendant's prior extensive experience with the criminal justice system.

This Court finds no violation of defendant's Sixth Amendment right to counsel.

### THE THIRD STATEMENT IN THE INTERVIEW ROOM AT U.S. MARSHALS' LOCKUP

With respect to the third statement, the Court will first recount the events leading up to the statement in question.

Defendant met with Attorney Isaac in the interview room at the U.S. Marshals' Lockup facility in the U.S. Courthouse. Defendant told Isaac that he could not afford to pay the attorney's fee. Isaac testified that he told defendant that he could not advise defendant whether or not to speak to police because he was not representing defendant. Isaac testified that he told defendant he should be represented by a federal defender.

Koger testified that at one point he entered the room while defendant and Isaac were conversing. Defendant initiated a conversation with Lt. Koger, but Isaac quickly stopped him, saying that he did not want to be put in the position of being defendant's attorney. After the consultation with defendant, Isaac spoke with Lt. Koger. Isaac did not give Koger permission to interview defendant. Attorney Isaac said that he told defendant that it was up to defendant whether or not he gave a statement to Koger.

There is some discrepancy between Isaac's affidavit dated August 21, 1997 and his testimony at the hearing. Paragraph 7 of the affidavit states that Isaac told Lt. Koger that defendant did not wish to speak to anyone without an attorney present. During direct examination, Isaac admitted Paragraph 7 may not be "exactly correct." Isaac is not sure whether that was what defendant told him or whether it merely reflects what Isaac told defendant, i.e., that defendant needed to have an attorney (a federal defender) present during questioning. In light of Isaac's testimony, the Court will interpret the affidavit as merely reflecting what Isaac told defendant.

Lt. Koger then re-entered the interview room. Defendant immediately initiated a conversation with Koger in the absence of any inquiry or questions from the police lieutenant. Defendant asked, "What would you like to talk about first?" Koger replied that he would like to talk about the homicides first. Defendant proceeded to give a statement, stating that he had been paid $10,000 by Jewell Lamont Allen and Tederick Jones for the murder of David Strickland. Defendant indicated that the reason for the murder was that Strickland had been indicted and Jewell Lamont Allen was afraid he would

talk. Defendant further revealed that the weapon he used was a 9 millimeter handgun and that Tederick Jones ("Teddy") conducted surveillance during the murders. He further admitted he was involved in drug trafficking and that he had purchased drugs from Allen, as well as that the clothing he had used was a black ninja outfit.

■ Central to both the Fifth Amendment and Sixth Amendment analyses is the issue of whether, after meeting with Attorney Isaac, defendant's subsequent conversation with Lt. Koger can be said to have been "police-initiated" *or* initiated by defendant. If "police-initiated," then *Edwards* and *Michigan v. Jackson* prohibit Lt. Koger from further questioning of the defendant, and any statements elicited would be inadmissible at trial. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). If, on the other hand, the Court finds that this interview was initiated by defendant, then *Edwards* and *Michigan v. Jackson* would be inapplicable. Waiver of defendant's Sixth Amendment right to counsel would be allowed, and assuming defendant waived that right, all statements made during the interview would be admissible. The Court will, therefore, address this issue first, before moving to the Fifth and Sixth Amendment discussions.

The unrebutted testimony of Lt. (now Capt.) Koger is that defendant initiated the conversation regarding the homicides and drug trafficking activities. This determination, of course, is a matter for the Court to decide based upon the credibility of Lt. Koger's testimony. But the Court need not base its decision solely on the police lieutenant's testimony, but may consider the attendant circumstances which surrounded defendant's making of the statement.

First, defendant exhibited a *pattern of behavior* evincing a willingness to engage police in conversation and to tell his story. At the Flint Police Department, defendant said, "I might as well tell you what happened because you have the clothes I wore and the gun I used to do the shooting." This manifested defendant's realization that his scheme had been uncovered by police. Then, in the

parking lot of the United States Courthouse, defendant expressed his fear of reprisal for talking to the police. This shows that defendant had considered the consequences of speaking. In addition, defendant responded affirmatively when asked if he wanted to speak to Lt. Koger. Lastly, defendant attempted to speak, without prompting, to Lt. Koger while Attorney Isaac was present in the interview room. All of these facts support the conclusion that defendant was ready and willing to provide the police with details of the crimes charged.

Second, defendant had just spoken to an attorney, who had counseled defendant that he should be represented by a federal defender. With this recent advice fresh in defendant's mind, it cannot be said that defendant was unaware of his right to remain silent or his right to have an attorney present. If defendant had desired to terminate the interview, at that point he could have simply requested counsel other than Mr. Isaac. Defendant did not do so. It was not Lt. Koger's duty to provide defendant with additional counsel when Lt. Koger had already scrupulously honored defendant's request.

Therefore, in light of Lt. Koger's unrebutted testimony, coupled with an examination of all the surrounding facts, I conclude that defendant initiated the conversation following his meeting with Mr. Isaac. This Court also found Capt. Koger, at the evidentiary hearing on defendant's motion, to be a credible witness.

 Turning to the Fifth Amendment issue, defendant was certainly "in custody" in the Marshals' Lockup facility at the U.S. Courthouse. Defendant initiated the conversation with Lt. Koger and was subsequently interrogated by the police lieutenant and incriminating statements were elicited. The *Edwards* rule in the Fifth Amendment context (and the parallel *Jackson* rule under the Sixth Amendment) provides that if defendant requests counsel, then all questioning must cease and further questioning is forbidden, *"unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (emphasis added); *see also Michigan v. Jackson,* 475 U.S. at 626, 106 S.Ct. 1404.

As discussed, it is apparent that defendant initiated a further "communication, exchange, or conversation" with police. Since this situation falls within the explicit exception to the *Edwards* and *Jackson* rules, the police were not duty bound to cease questioning. Nevertheless, it might be argued that defendant's statements were made in the context of a custodial interrogation and therefore the government has the burden of proving that defendant voluntarily, knowingly and intelligently waived his Fifth Amendment rights. *See State v. Williams,* 535 N.W.2d 277, 289 (Minn.1995).

Assuming *arguendo* that defendant's statement was made in the context of a custodial interrogation, defendant had been admonished with *Miranda* warnings earlier at the Flint Police Department and had met with counsel of his choice. Attorney Isaac, although ultimately rejected by defendant, had advised defendant that he should seek representation from a federal defender. Under such circumstances, this Court finds that defendant Thornton made a "knowing and intelligent" waiver of his Fifth Amendment rights. The remaining issue is whether defendant's waiver was "voluntary."

With respect to the voluntariness issue, as mentioned above, there is some testimony by Attorney Isaac that defendant appeared "scared and confused," and that Isaac felt badly for defendant upon leaving the courthouse. Isaac testified that defendant allegedly felt "pressured" by the police to make a statement. In characterizing Lt. Koger's style of interrogation, however, Isaac stated that Koger is "not a rubber hose type of guy; he does not use a threatening manner."

Just as with the first statement, Isaac's anecdotal testimony might appear to militate against a finding of waiver, but this Court does not find Isaac's observations to be concrete or specific enough to allow the conclusion that defendant's waiver of his rights was involuntary. There is no evidence that defendant was coerced, intimidated, bullied, threatened or subjected to any form of de-

ceptive tactic designed to trick defendant into speaking. See *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The conclusion that defendant's waiver was voluntary is further supported by the testimony of Isaac, regarding Lt. Koger's style of interrogation, that Koger was not a "rubber hose type of guy" and that "he does not use a threatening manner." After reviewing the totality of the circumstances surrounding defendant's waiver, it is clear that defendant voluntarily, knowingly and intelligently waived his Fifth Amendment rights.

 Analyzing the third statement under the Sixth Amendment, since the conversation was initiated by defendant, the *Michigan v. Jackson* rule invalidating waiver is inapplicable. *See Michigan v. Harvey*, 494 U.S. 344, 353, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); *see also* discussion, *supra*, relating to First Statement at Flint Police Department. Therefore, the only issue remaining for determination is whether defendant validly *waived* his Sixth Amendment right to counsel. There must have been "an intentional relinquishment or abandonment of a known right or privilege." *Patterson*, 487 U.S. at 292, 108 S.Ct. 2389 (*quoting Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019). The court reviewing a claim of waiver should "indulge every reasonable presumption against waiver." *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019. The burden of proof rests on the government to show a valid waiver. *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). There need not be, however, an explicit statement of waiver by the defendant. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

In light of the *Patterson* Court's holding that *Miranda* warnings are sufficient to make a defendant aware of his Sixth Amendment right to counsel, and this Court's finding that defendant had waived his Fifth Amendment rights by initiating the conversation, the Court concludes that the government has met its burden of proving that defendant waived his Sixth Amendment right to counsel. *See Patterson*, 487 U.S. at 297–98, 108 S.Ct. 2389. Defendant intentionally relinquished his right to counsel when he initiated a conversation with Lt. Koger immediately after being advised by Attorney Isaac that he should be represented by a federal defender. Defendant chose to disregard this advice and spoke at his peril.

For the reasons set forth above, the Court concludes that there was no violation of defendant's Fifth or Sixth Amendment rights with respect to any of the three statements made by defendant.

NOW, THEREFORE, IT IS HEREBY ORDERED that defendant's motion to suppress out of court statements is **DENIED**.

**SO ORDERED.**