**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ozzie Lee AVERY, Jr.,**
**Defendant-Appellant.**

**No. 82–5589.**

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1983.

Decided Sept. 29, 1983.

Rehearing and Rehearing En Banc
Denied Jan. 23, 1984.

---

7. *See* n. 4 *supra.*

Frank E. Haddad, Jr., argued, Louisville, Ky., Robert D. Simmons, Bowling Green, Ky., for defendant-appellant.

Alan Sears, Richard Dennis, Asst. U.S. Attys., Louisville, Ky., argued, for plaintiff-appellee.

Before CONTIE, Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

CONTIE, Judge.

Ozzie Lee Avery appeals his jury conviction on one count of attempted destruction of a building used in interstate commerce by means of an explosive. 18 U.S.C. § 844(i). In this appeal we are required, among other things, to determine whether the materials used in the attempted destruction fall within the statutory definition of "explosive." 18 U.S.C. § 844(j). After careful consideration, we affirm the defendant's conviction.

### I.

At 11:06 p.m. on the evening of February 16, 1982, the Bowling Green, Kentucky police station received a burglar alarm signal from a local medical office building. The officer who was dispatched to the scene testified that he turned his car spotlight on and "threw [it] into the general area of the back door to make sure that the back door looked intact." At this point, the officer noticed the defendant "crouched down" near a small storage door at the rear of the building. The defendant then ran to his car, and sped from the parking lot. After a brief pursuit, the defendant stopped his car and the officer arrested him. The car was registered in the defendant's name, and had silver duct tape covering all four guidelights on the sides of the car and the lights normally illuminating the license plates. The license plate itself was covered with oil and dirt.

Following defendant's arrest, the officer placed him in the patrol car and advised him of his *Miranda* rights. The two then returned to the medical building. A subsequent inspection of the building revealed that the rear storage door had been pried open. Inside a crawl space underneath the building, police found a substantial amount of flammable materials which included (1) four canisters of propane, (2) two gallon jugs and fifteen milk cartons containing gasoline, (3) three Wall Street Journals with address labels listing the defendant's name and address, and (4) two other newspapers and a roll of wax paper.

Thereafter, defendant was taken to the Bowling Green police station for booking. Detective David Payne gave defendant a standard Waiver of Rights Form which the defendant read and refused to sign. Payne again advised defendant of his *Miranda* rights and the defendant indicated that "he didn't want to say anything about the case", and that he wanted to talk to his lawyer. The defendant contacted his attorney on the telephone, and the attorney told Payne that his client did not wish to make a statement at this time. After this conversation, Payne completed the defendant's identification form. The record indicates that Payne asked the defendant several questions on such topics as the defendant's address and date of birth. Payne also used the defendant's driver's license as a source of information. The defendant was also fingerprinted and photographed.

After the booking process was completed, the officer who was with the defendant and Detective Payne took the paperwork into another room in order to have it typed. As Payne and the defendant sat in the room alone, defendant suddenly stated "[d]o you think if I make restitution for the damages that have been done, would the charges be dropped?" This statement was admitted at trial after the district court determined that the defendant had voluntarily waived his privilege against self-incrimination. Defendant was later convicted on one count of attempted destruction of a building used in interstate commerce by means of an explosive, 18 U.S.C. § 844(i), and now brings this appeal.

### II.

When this incident occurred in February 1982, 18 U.S.C. § 844(i) read in pertinent part:

(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for

not more than ten years or fined not more than $10,000, or both; . . . .

We are aware that Congress has since amended section 844(i) to include destruction or attempted destruction "by means of *fire or* an explosive, . . . ." *See* Anti-Arson Act of 1982, Pub.L. No. 97–298, § 2(c), 96 Stat. 1319 (1982) (codified as amended at 18 U.S.C. § 844(i) (West Supp.1983)). Nevertheless, since this amendment was not approved until October 12, 1982, we must interpret the statute as it existed on the date of the alleged offense.

Defendant contends that the materials used in the attempted destruction are no more than "very common materials of arson" which do not fall within the statutory definition of "explosive." In this context, defendant maintains that section 844(i) was never meant to be a federal arson statute but was intended to protect buildings against "the specific evil of bombing."

18 U.S.C. § 844(j) defines the term "explosive" for purposes of section 844(i) as follows:

> For purposes of subsection [ ] . . . (i) of this section, the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

Section 232(5), which section 844(j) incorporates by reference, further defines the term "explosive or incendiary device" as follows:

> (5) The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

We acknowledge that, prior to the 1982 amendments to section 844(i), the circuits were split over whether a mixture of oxygen and a combustible liquid such as gasoline constituted an "explosive" as defined by 18 U.S.C. § 844(j). The Ninth Circuit concluded that such air-fuel mixtures do not fall within the statutory definition of "explosive" after finding "no indication that [section 844(i) ] was meant to overlap state arson law relating to buildings in interstate commerce." *United States v. Gere,* 662 F.2d 1291, 1296 (9th Cir.1981) (fire ignited by "trailers" of photocopier fluid and fluid-soaked materials); *Accord United States v. Cutler,* 676 F.2d 1245, 1248 (9th Cir.1982) (twenty gallons of gasoline spread throughout warehouse). The Seventh, Tenth and Eleventh Circuits, however, took the position that such air-fuel mixtures were "explosives" under section 844(j). *United States v. Agrillo-Ladlad,* 675 F.2d 905, 907–12 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982) (naptha-soaked newspapers spread across floor); *United States v. Poulos,* 667 F.2d 939, 941–42 (10th Cir.1982) (gasoline poured around floor of building); *United States v. Hewitt,* 663 F.2d 1381, 1389 (11th Cir.1981) (ten gallons of gasoline poured down roof vent into building).

In this case, the defendant did not rely solely on containers of gasoline. Instead, he used a combination of gasoline and four canisters of propane gas. The explosive potential of this combination was described by Col. Warren L. Parker, the government's expert witness. Parker referred to the materials assembled in the crawl space as an "improvised incendiary bomb," and identified the two potential sources of an explosion to be (1) the propane canisters, and (2)

the vapors from the gasoline. He described the propane as being "a very volatile gas contained under pressure." Once the gasoline was ignited, Parker testified that the build-up of heat and intensity would cause the propane canisters to "rupture and vent adding an explosive force." He added that there might also be a second "vapor type explosion" once the flames reached the propane gas which had escaped from the canisters. Parker also indicated that the vapors from the gasoline could have spread throughout the building to form an "explosive gasoline air vapor mixture." When commenting on the destructive capability of these materials, Parker testified:

> With the amount of gasoline and propane, there could have been an explosion that could have completely destroyed the whole building in the process of starting the fire.

The explosive potential of these materials is clearly established in the record. Indeed, after reviewing the plain wording of sections 844(j) and 232(5), the testimony of Col. Parker, and the applicable case law, we are convinced that these materials are properly categorized as an "incendiary bomb" under 18 U.S.C. § 232(5). Accordingly, we hold that these materials constitute an "explosive" as defined by section 844(j). Since Congress has amended 18 U.S.C. § 844(i) to include destruction by fire, we should not have to face this problem again.

### III.

The defendant argues that his "restitution" statement to detective Payne should have been suppressed because it was the product of police interrogation which occurred after he asserted his privilege against self-incrimination. Defendant further argues that he made no knowing, voluntary and intelligent waiver of that right. The government maintains that no interrogation occurred, and that the statement was a spontaneous utterance whose admissibility is not affected by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is uncontested that the defendant was advised of his *Miranda* rights

when he was taken into custody and that he asserted his privilege against self-incrimination. At that point, detective Payne questioned the defendant on subjects such as defendant's date of birth and address in order to complete the identification form. The issue, therefore, is whether this questioning constitutes "interrogation" by police.

The Supreme Court in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) defined "interrogation" as referring "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689. Thus, "interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689.

We believe the questioning in this case falls outside the context of the inherently coercive custodial interrogation for which the *Miranda* safeguards were designed, *Roberts v. United States,* 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980), and thus should not be characterized as "interrogation." The record indicates that the questions were part of a routine procedure to secure biographical data to complete the booking process. These questions did not relate, even tangentially, to criminal activity. Moreover, there is no evidence that the defendant was particularly susceptible to these questions, or that police somehow used the questions to elicit an incriminating response from the defendant. Under these circumstances, we would be creating a rule "broader than that required to implement the policy of *Miranda* itself" were we to find that the police interrogated the defendant in this case. *See Baumann v. United States,* 692 F.2d 565, 577 (9th Cir. 1982); *United States v. Booth,* 669 F.2d 1231, 1237–39 (9th Cir.1981); *United States ex rel. Hines v. Lavallee,* 521 F.2d 1109, 1112–13 (2nd Cir.1975), *cert. denied,* 423

U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *United States v. Menichino,* 497 F.2d 935, 941 (5th Cir.1974); *But see United States v. Downing,* 665 F.2d 404, 406–07 (1st Cir.1981).[1] In reaching this result, we acknowledge that courts should carefully scrutinize the factual setting of each encounter of this type. Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response. *See, e.g., United States v. Hinckley,* 672 F.2d 115, 123–26 (D.C.Cir.1982). Ordinarily, however, the routine gathering of biographical data for booking purposes should not constitute interrogation under *Miranda. United States v. Booth,* 669 F.2d at 1238.

█ Since the defendant was not being interrogated at the time of his "restitution" statement, we hold that the statement was a spontaneous and voluntary utterance which was properly admitted at trial.[2] The record indicates that Avery was alert and under no compulsion to speak when he made this statement to detective Payne. We therefore adhere to that portion of the *Miranda* decision which states that "[a]ny statement given freely and voluntarily

without any compelling influences is, of course, admissible into evidence. *Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1629; *see also United States v. Anthon,* 648 F.2d 669, 673–74 (10th Cir.1981) *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1039, 71 L.Ed.2d 320 (1982); *United States v. Foskey,* 636 F.2d 517, 521–22 (D.C.Cir.1980).

### IV.

The defendant asserts that the government's attorney made several improper comments during closing argument which violated defendant's right to a fair trial. When analyzing charges of prosecutorial misconduct, we are guided by Justice Sutherland's timeless statement in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed.2d 1314 (1935) that a United States Attorney "may strike hard blows" in the course of a prosecution, but "is not at liberty to strike foul ones." *Id.* at 88, 55 S.Ct. at 633.

The defendant first contends that the prosecutor urged and "very likely" caused jurors to conduct an experiment in the jury room to determine whether the defendant could have moved the explosive materials into the crawl space in a three minute period. The record indicates that it took ap-

1. Relying upon the "unavoidable coerciveness of police questioning after an accused has requested the presence of counsel," the First Circuit in *United States v. Downing,* 665 F.2d 404 (1st Cir.1981) "declined the government's invitation to create a broad exception to the Fifth Amendment for police questions asked without 'investigative intent' or pursuant to 'required administrative procedures' ". *Id.* at 406–07. In reaching this result, the First Circuit has apparently taken the position that any form of direct questioning of a suspect in custody constitutes "interrogation" under *Miranda.* We note, however, that *Downing* is factually distinguishable from this case. Rather than asking the defendant routine questions to gather biological data, the drug enforcement agents in *Downing* questioned the defendant about the existence and location of his airplane, which was apparently being used to transport illegal narcotics. Thus, the questions in *Downing* were much more likely to elicit an incriminating response from the defendant than the questions in this case.

2. Our holding in this case is unaffected by the Supreme Court's recent decisions in *Oregon v. Bradshaw,* ——— U.S. ———, 103 S.Ct. 2830, 77

L.Ed.2d 405 (1983), *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and this circuit's decision in *Clark v. Jago,* 676 F.2d 1099 (6th Cir.1982). These cases indicate that once an accused has asserted his right to counsel, further interrogation of the accused must not take place unless the accused himself initiates further communications, exchanges or conversations with the police and makes a knowing, voluntary and intelligent waiver of his right to counsel and his right to remain silent. *Oregon v. Bradshaw, supra,* ——— ———, 103 S.Ct. at 2833; *Edwards v. Arizona, supra* at 484–85 & n. 9, 101 S.Ct. at 1884–85 & n. 9; *Clark v. Jago, supra* at 1113. In this case, we determined that Avery did assert his right to counsel, but that detective Payne's questions did not constitute "interrogation" under *Miranda.* Moreover, while we acknowledge that Avery's "restitution" statement could be construed as initiating a conversation under *Bradshaw, Edwards* and *Clark,* there is no evidence that police questioned Avery in any manner after this statement was made.

proximately three minutes for the first officer to respond to the burglar alarm. In his closing argument, the prosecutor buttressed his argument that the materials could have been moved in three minutes by suggesting that the jurors attempt to hold two of the milk cartons in each hand. Defense counsel responded that "there is no way in the world" the defendant could have moved the materials into the crawl space in three minutes. This prompted the prosecutor during rebuttal to ask the jury to recreate portions of the defendant's actions:

> I submit to you [to] try this scenario; Hasp on the door, set all the materials by the door, pry the hasp off by whatever means, get inside and begin taking the fuel in, set the box in and maybe it is fifteen feet, the longest distance we have, maybe this distance, crawling on hands and knees, two jugs at a time, seven pounds a piece, set fourteen pounds a piece in each hand. Mr. Avery looks like he could probably pick up fourteen pounds, crawling on the floor, hands and knees, three minutes. I believe it would be easy. I believe by working continuously it could be done.

■ We do not believe the prosecutor's comments deprived defendant of a fair trial. The record reveals that the defense, through expert testimony, put into issue the question of how long it would take to place the materials into the crawl space. Indeed, the defense theory of the case was that the defendant could not possibly have moved and assembled all of the materials in a three minute period. This argument was repeated by defense counsel on at least two occasions during his closing argument. Under these circumstances, we believe the prosecutor could respond to defendant's argument by asking the jury to handle the milk cartons and recreate portions of the defendant's actions. Even assuming the jury did recreate the defendant's actions, we find no error in such conduct. The defendant does not allege that the jurors were exposed to any extraneous materials during their deliberations. *See, e.g., United States v. Renteria,* 625 F.2d 1279, 1283–84 (5th Cir.1980); *Farese v. United States,* 428

F.2d 178, 181–82 (5th Cir.1970); *United States v. Castello,* 526 F.Supp. 847, 850–51 (W.D.Tex.1981). While this court recognizes the possibility that other types of experiments in the jury room could create substantially prejudicial influences on the jury's deliberations, we believe jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict. *United States v. Hephner,* 410 F.2d 930, 936 (7th Cir.1969); *see also Miller v. Harvey,* 566 F.2d 879, 881 (4th Cir.1977), *cert. denied,* 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978).

■ The defendant also contends that the prosecutor committed reversible error by allegedly expressing his personal opinion as to the justice of his cause in the following statement:

> I ask you to uphold the duty that you undertook when you took that oath as a juror. You stated you would uphold the law of the United States. I ask you to do so today, and I would ask you based upon the evidence to return a verdict of guilty against Mr. O.L. Avery. Thank you.

Defendant argues that these remarks "clearly inferred that [the jury] would not be upholding the laws of the United States if they did not convict the defendant."

This circuit has previously indicated that a prosecutor's statement of personal belief will usually not "rise to *reversible* error, ... if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury." *United States v. Bess,* 593 F.2d 749, 757 (6th Cir. 1979). While we do not expressly approve of the prosecutor's comment, we cannot say it amounts to reversible error in this case. Since the prosecutor clearly asked the jury to return a verdict against the defendant "based upon the evidence," we do not believe the prosecutor's request to uphold the law of the United States was flagrant. Moreover, we believe the evidence against the defendant was overwhelming. *See Berger v. United States,* 295 U.S. at 89, 55 S.Ct.

at 633. Accordingly, we will not reverse defendant's conviction on the basis of this remark.

### V.

■ Defendant's final contention is that the district court committed reversible error when it refused to instruct the jury that it had the power to acquit the defendant even though he was guilty of the charged offense. The instruction itself reads that "a jury is entitled to acquit the defendant because it has no sympathy for the government's position."

This argument is completely without merit. Although jurors may indeed have the power to ignore the law, their duty is to apply the law as interpreted by the court and they should be so instructed. *Sparf & Hansen v. United States,* 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895); *United States v. Wiley,* 503 F.2d 106, 107 (8th Cir. 1974); *United States v. Dougherty,* 473 F.2d 1113, 1130–37 (D.C.Cir.1972); *United States v. Dellinger,* 472 F.2d 340, 408 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).

Accordingly, the judgment of the district court is AFFIRMED.