UNITED STATES of America,
Plaintiff,

· v.

Karim KOUBRITI; Ahmed Hannan; Youssef Hmimssa, a/k/a Patrick J. Vuillaume, a/k/a, Michael Saisa, a/k/a Jalali; Abdella Lnu, a/k/a Jean Pierre Tardelli, a/k/a George Labibe, a/k/a Hussein Mohsen Safiddine, a/k/a Nabil Hayamm; and Farouk Ali–Haimoud, a/k/a "Khalid," Defendants.

No. 01–CR–80778.

United States District Court,
E.D. Michigan,
Southern Division.

April 15, 2002.

Richard Convertino, Asst. U.S. Atty., Detroit, MI, for U.S.

Richard Helfrick, Detroit, MI, for Koubriti.

Stephen T. Rabaut, St. Clair Shores, MI, for Hmimmsa.

James C. Thomas, Detroit, MI, for Hannan.

Kevin S. Ernst, Detroit, MI, for Ali–Hammoud.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS

ROSEN, District Judge.

On September 27, 2001, the Grand Jury returned a two-count Indictment charging Karim Koubriti, Ahmed Hannan, and Youssef Hmimssa with "Fraud and Misuse of Visas, Permits and Other Documents" in violation of 18 U.S.C. § 1546(a) and 2, and "Fraud and Related Activities in Connection with Identification Documents and Information" in violation of 18 U.S.C. § 1028(a)(6) and 2.[1] The charges against Defendants arose out of the FBI's search for Nabil Al–Marabh, a suspect/potential witness concerning the September 11, 2001 attacks on the World Trade Center which led the FBI to a residence at 2653 Norman Street in Detroit which was found to be occupied by Koubriti and Hannan. The false documents giving rise to the initiation of this action were found in the Norman Street residence on September 17, 2001.

1. Defendant Hmimssa filed a motion for severance, and on March 22, 2002, pursuant to the stipulation of the parties, the Court entered an Order granting that motion. Subsequently, on March 27, 2002, the Grand Jury issued a First Superseding Indictment against Koubriti and Hannan which added to the document fraud charges alleged in the original indictment a third charge of Conspiracy to Engage in Fraud and Misuse of Visas, Permits and Other Documents. Two other individuals, Farouk Ali–Haimoud and Abdella Lnu, were also named as Defendants in the First Superseding Indictment. Farouk Ali–Haimoud was originally charged along with Koubriti and Hannan in a pre-indictment criminal complaint on September 18, 2001, however, the charges alleged against him in the complaint were dismissed without prejudice when he was not charged by the Grand Jury in the September 27, 2001 Indictment. As the Government's investigation into this matter continued, however, new evidence was discovered which led to the charges asserted against Ali–Haimoud in the First Superseding Indictment.

This matter is presently before the Court on Defendant Koubriti's Motion to Suppress Evidence in which Koubriti seeks an Order suppressing the evidence seized in the search of the Norman Street residence and suppressing statements made by him during the search. Defendant Hannan has joined in his co-defendant's motion.[2] The Court conducted a two-day evidentiary hearing on this matter on January 28, 2002 and February 7, 2002, at which hearing the Court heard the testimony of FBI Agents Mary Ann Manescu and Michael Thomas, INS Agent Mark Pilat, and Arabic language specialist Nazih "George" Moaikel, who acted as an interpreter at the time of the search. At the close of the hearing, the Court directed the parties to file briefs addressing the *Miranda* and Fourth Amendment issues raised by Defendants. The parties have complied with the Court's directive and filed their post-hearing briefs on February 28, 2002.

Having heard the testimony of the witnesses, and having reviewed and considered the parties' briefs and the arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## I. *PERTINENT FACTS*

On September 17, 2001, at approximately 5:45 p.m., Agents of the Detroit Joint Terrorism Task Force,[3] went to 2653 Norman Street in Detroit, Michigan to interview Nabil Al–Marabh, a potential witness concerning the September 11, 2001 attacks

six days earlier on the World Trade Center and the Pentagon. Al–Marabh was listed as on the FBI "Watch List" of people believed to participate in possible terrorist activities. He also had an outstanding warrant for his arrest for assault with a dangerous weapon.

The FBI had connected Al–Marabh with two possible addresses in Detroit—the Norman Street address and another address on Wyoming Street. Based upon the information they had obtained, Task Force agents determined that the Norman Street address looked like a good address. Therefore, FBI Special Agents Mike Thomas, Paul Heyard, and Mary Ann Manescu; INS Agents Joe Gillette and Mark Pilat, State Department Special Agent Edward Seitz and FBI language specialist Nazih "George" Moaikel were dispatched to that address to locate and interview Al–Marabh.

Because the information the Task Force had on Al–Marabh indicated that he could be dangerous, when the agents arrived at the house, Agents Heyard, Manescu, Pilat and Seitz proceeded to the backyard of the house, while Agents Thomas and Gillette proceeded to the front door. Language Specialist Moaikel also proceeded the front of the house, but he remained on the sidewalk at the bottom of the stairs.

2653 Norman Street is the upper flat of a two-flat house. It is entered by a street-level door that opens to a stairway leading up to the upper-level apartment. Upon approaching the door, the agents noticed that Al–Marabh's name was on the

---

**2.** At a pre-trial conference held on April 12, 2002, added Defendant Ali–Haimoud also verbally joined in this motion to suppress, but reserved the right to add additional arguments upon further review of the record. If, after reviewing the record and this Opinion and Order, Defendant Ali–Haimoud wishes to assert additional arguments, he may do so by way of a motion for reconsideration.

**3.** The Detroit Joint Terrorism Task Force is comprised of agents and officers from the Federal Bureau of Investigation (FBI), the Bureau of Alcohol, Tobacco and Firearms (ATF), the Immigration and Naturalization Service (INS), the Drug Enforcement Administration (DEA), the Internal Revenue Service (IRS), U.S. Customs Service, the State Department, Michigan State Police and the Dearborn Police Department.

mail box for the upper flat. Agent Thomas testified that he knocked on the door and Defendant Karim Koubriti answered. At the time, Mr. Koubriti was wearing only boxer shorts and a tee shirt. Agent Thomas identified himself to Koubriti and told him that the agents were looking for Al–Marabh and showed him a picture of Al–Marabh for identification. Koubriti told Agent Thomas that he did not know Al–Marabh. When asked about the name on the mailbox, Koubriti replied that he had only lived there for two weeks and that Al–Marabh may have previously lived in the apartment.

Agent Thomas then asked Koubriti for his identification. Koubriti said that it was upstairs in the apartment. As Koubriti turned to go up the stairs, Agent Thomas asked, "Excuse me. Do you mind if we come up with you?" [1/28/02 Tr. p. 188.] Koubriti answered, "No, not at all." *Id.* Accordingly, Agents Thomas and Gillette followed Koubriti up the stairs. Agent Thomas testified that the conversation with Koubriti at the door was conducted entirely in English. *Id.* at 187.

Upon entering the upper-flat apartment, Agents Thomas and Gillette conducted a protective sweep of the premises during which they found Defendants Ahmed Hannan and Farouk Ali–Haimoud. Ali–Haimoud was immediately observed sleeping in the dining room area. Mr. Hannan was found sleeping on the floor in the back bedroom on the left-hand side. Agent Thomas woke him and ordered both Hannan and Ali–Haimoud into the living room.

Once all three men were gathered together, Agent Thomas went downstairs and signaled to the others that it was safe for them to enter. (Agent Gillette, meanwhile, remained with the three Defendants.) Agents Manescu, Pilat, Heyard and Language Specialist Moaikel then went up the stairs and entered the upper flat. Special Agent Seitz remained outside of the house.

The agents then proceeded to interview the three Defendants. All of the agents testified that while talking to the Defendants, the atmosphere was very calm, very matter-of-fact and conversational. The Defendants sat or stood, as they chose, and at least one of them smoked cigarettes. The testimony was uniform that no threats were made, nobody made any threatening gestures, and no guns were unholstered.

The agents questioned the Defendants about their citizenship, United States residency and employment history. While Agents Manescu and Thomas questioned the men about their employment history, Agent Pilat questioned the men about their alien registration and then verified their status with the INS. Only Defendant Koubriti was able to produce a resident alien "green" card. Hannan and Ali–Haimoud told the agents that their green cards were in a safe deposit box. Agent Pilat testified that it is a violation of federal law for a resident alien over 18 years old not to be in possession of his resident alien "green" card.[4] [*See* 2/7/02 Tr. pp. 74–75.]

During the protective sweep of the Norman Street residence conducted by Agents Thomas and Gillette, Agent Thomas observed in plain view on top of a dresser in one of the bedrooms two SkyChef/Detroit Metropolitan Airport employee identification badges bearing Koubriti's and Hannan's pictures. Agent Thomas testified that when he discovered the SkyChef badges, he did not know what level of airport access those badges allowed.

However, when the Defendants were asked about where they had been em-

---

**4.** 8 U.S.C. § 1304(e) requires all aliens over 18 years of age to carry their alien registra- tion papers at all times. Violation of the statute is a misdemeanor.

ployed since entering the United States, Defendants Koubriti and Hannan never mentioned SkyChef. They stated that they worked at Technicolor in Livonia and detailed several other restaurant/dishwashing jobs, but did not indicate that they had ever worked at SkyChef.

When confronted with the SkyChef IDs, Hannan and Koubriti appeared surprised. [*See* Agent Manescu testimony, 1/28/02 Tr. pp. 28–30.] When they were asked to explain why they had them, the men indicated that they had worked at SkyChef until they were involved in a car accident.

Agent Thomas testified that his overriding concern was that the Defendants may have had access to aircraft at the Detroit Metropolitan Airport. [2/7/02 Tr. p. 46.][5] Because the Defendants' story "did not add up," Agent Thomas testified that he was suspicious and, therefore, decided that the agents should search the flat. He told the Defendants that he wanted to handcuff them for the safety of both the agents and the Defendants. [2/7/02 Tr. p. 22.]

Before beginning the search, the agents asked for the Defendants' consent to do so. Language Specialist Moaikel testified that he translated the agents' request for permission to search and asked all three of the Defendants for their consent. [*See* 1/28/02 Tr. pp. 130–131; 168–169] Mr. Moaikel testified that Koubriti immediate-

ly said that it was okay, *id.* at 130, and that Koubriti turned to the other two Defendants and asked them if they had any objection, and that they said, no, because they had nothing to hide. *Id.* at 169. [*See also*, Testimony of Mary Ann Manescu, 1/28/02 Tr. p. 34.] Mr. Koubriti also executed a written consent which Mr. Moaikel testified he translated into Arabic for the Defendants, sentence-by-sentence.[6]

The agents then began the search in one of the bedrooms. (Agent Pilat and Language Specialist Moaikel remained in the living room with the three Defendants while the search was being conducted by the other agents.) Within five minutes of initiating the search, Koubriti told Language Specialist Moaikel that there were false documents in the bedroom. [1/28/02 Tr. p. 137–138.] Moaikel testified that he did not ask Koubriti anything; that Koubriti simply volunteered the information. *Id.* at 138.

Mr. Moaikel then told Agent Thomas what Koubriti had said and he then escorted Koubriti into the bedroom. Agent Thomas at the time was searching the desk while Agent Manescu was opening a bag found in the bedroom closet.

Koubriti pointed with his head to a drawer of the desk indicating that the documents were in that drawer underneath some video tapes. *Id.* The documents were then retrieved by Agent Thomas.[7] Koubriti indicated that the doc-

---

5. Agent Pilat later found out from the FAA that the badges did not grant restricted area access. [*See* 2/07/02 Tr. pp. 68–70.]

6. Agent Thomas and Mr. Moaikel testified that, prior to executing the consent to search form, the Defendants were asked whose residence was it. Defendant Koubriti told the agents that it was his residence, and that although he did not have a lease, he was the one who paid $400 monthly rent to the landlord. .

7. The documents found in the desk drawer were the following:

 a. "World Service Authority" passport in the name of Michael Saisa, date of birth, October 20, 1976.

 b. United States Social Security Card in the name of Michael Saisa, number 034–54–6538.

 c. United States Immigration form I–94, admission number 5303185 7 07.

 d. United States visa, issued to Michael Saisa.

uments belonged to a former roommate who Koubriti only knew as "Jalali." Agent Manescu, meanwhile, discovered a day planner in the bag she found in the closet.[8] Koubriti indicated that those items also belonged to "Jalali."

Agent Thomas testified that after the discovery of the day planner and the documents, the agents immediately stopped the search and obtained a search warrant for the premises. The Defendants, meanwhile, were placed under arrest, and transported to the Detroit FBI office where they were read their *Miranda* rights for the first time.

## II. *DISCUSSION*

### A. *THE PROTECTIVE SWEEP OF THE APARTMENT WAS JUSTIFIED*

Defendants first argue that the agents were not justified in performing a "protective sweep" upon entering the apartment. They contend that a "protective sweep" cannot be justified because there was no "in-home arrest" prior to the protective sweep nor any intention to arrest anyone at the time the agents initially entered the apartment. Their position is that *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) only authorizes protective sweeps when they are done in conjunction with an arrest. While the Court acknowledges that some circuits appear to take this restrictive view of the holding in *Buie, see e.g., United States v. Wilson*, 36 F.3d 1298, 1306 (5th Cir.1994), the Sixth Circuit has expressly rejected such a narrow construction..

The same argument advanced by Defendants was made by the Defendant in *United States v. Taylor*, 248 F.3d 506 (6th Cir.2001). In that case, officers from the Kalamazoo Valley Enforcement Team had received information that Joseph Taylor was suspected of dealing drugs and selling illegal weapons. Although the officers did not have probable cause to arrest Taylor, they decided to go to his apartment to question him.

Upon arriving at the apartment, the officers knocked on the door to which someone from within the apartment asked, "Who is it?" They identified themselves as police officers at which point they heard "shuffling" inside. Ultimately, the door was answered by a man who later identified himself as Taylor's brother, Renaldo Hill. The officers asked if they could come inside and Hill invited them in.

The officers told Hill that they were looking for Taylor. Hill acknowledged that Taylor lived there but said that he had gone to the gym. The officers then observed in plain view a stem of marijuana at which point they told Hill they were going to secure the area so they could get a search warrant and were going to perform a protective sweep to ensure that there were no other people in the apartment.

During the execution of the protective sweep, the officers discovered Defendant Hill crouching fully clothed in the bathtub behind the shower curtain. One of officers, Officer Bagley, also opened a closet near the bathroom and discovered an open

---

> e. United States Immigration Service Alien Identification Card, number A91199150.
> The INS and State Department subsequently confirmed that these documents were fraudulent.

**8.** The day planner contained notations related to an American military base in Turkey, Alia Airport in Jordan and the "American foreign minister." It also contained hand-drawn sketches of what appeared to be a diagram of an airport flight plan, including aircraft and runways. The day planner is the subject of a pending discovery motion which will be addressed by the Court in a separate Order.

duffle bag revealing baggies of processed marijuana. Officer Bagley did not seize the marijuana but instead left the premises to obtain a search warrant.

When Bagley returned an hour later with a search warrant, the officers seized the duffle bag which, it turns out, contained approximately 20–30 pounds of marijuana. They also found and seized approximately one pound of powder cocaine, some cocaine base, nearly $25,000 in cash, an assortment of drug paraphernalia, and a 9 mm pistol—equipped with a laser scope—strapped underneath an ironing board aimed at the front door. After completing the search, the officers arrested Taylor. *Id.* at 510.

Taylor moved to suppress the evidence found in his apartment. He argued that the officers violated his Fourth Amendment rights by conducting a protective sweep of his apartment when they had not first placed Hill under arrest and in the absence of facts that would have warranted such a search in conjunction with an arrest, and thus the subsequent search that ultimately exposed the hidden cocaine, crack, marijuana, money and gun was tainted. Both the district court and the Sixth Circuit found no merit in Taylor's argument. The Court of Appeals explained:

> The United States Supreme Court has endorsed the practice of conducting a protective sweep of an area to ensure police officer safety when arresting suspects. *See Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In *Buie*, the Court concluded: [T]he Fourth Amendment would permit the protective sweep undertaken here if the searching officer "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing"

that the area swept harbored an individual posing a danger to the officer or others.

*Id.* at 327, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

Citing *Buie*, we have said that "[i]n order for officers to undertake a protective sweep of an area they must articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." *See United States v. Biggs*, 70 F.3d 913, 915 (6th Cir.1995). *Biggs* was also decided in the context of a protective sweep made incident to the lawful arrest of a suspect.

**Taylor argues that a protective sweep is authorized only when it is made incident to a lawful arrest. Therefore, he contends, because Hill had not been arrested when the officers made their cursory search of Taylor's apartment, the sweep was per se invalid. In contrast, the government argues that while *Buie* and *Biggs* were each decided in the factual context of officers' making an arrest, nothing in the those opinions indicates that an arrest is a mandatory prerequisite for conducting a protective sweep of the area. The government further points out that the *Buie* decision was based upon the reasoning set forth in the Supreme Court's earlier decisions in *Terry* and *Long*, both of which were investigative stop cases.**

**We believe the government presents the more compelling argument.** Once an officer has probable cause to believe contraband is present, he must obtain a search warrant before he can proceed to

search the premises. [Citation omitted.] However, the Supreme Court has held that because evidence may be removed or destroyed before a warrant can be obtained, an officer does not violate the Fourth Amendment by securing the area to be searched and waiting until a warrant is obtained.... We think that it follows logically that the principle enunciated in *Buie* with regard to officers making an arrest—that the police may conduct a limited protective sweep to ensure the safety of those officers—applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained. **We emphasize, however, that the purpose of such a protective sweep is to protect the safety of the officer who remains at the scene, and for that reason, the sweep must be limited to a cursory search of the premises for the purpose of finding persons hidden there who would threaten the officer's safety.**

248 F.3d at 513 (emphasis added). *See also, United States v. Morgan,* 2002 WL 480964, 33 Fed.Appx. 603 (3rd Cir.2002) (unpublished decision; text available on WESTLAW) (police officers found to have had reasonable suspicion that criminal activity was taking place in defendant's residence were justified in entering and subsequently conducting a protective sweep of the premises without having any prior intent to arrest defendant); *United States v. Brooks,* 2 F.3d 838, 842 (8th Cir.1993) (after a consensual entry into a private residence, police can pat down a suspect if they have a reasonable particularized suspicion that the suspect is armed); *United States v. Flippin,* 924 F.2d 163, 165–66 (9th Cir.1991).

 In this case, Agent Thomas had a reasonable belief that a dangerous individual, Nabil Al–Marabh, or an associate of his, might be present inside the apartment based upon the following specific facts and

the rational inferences that could be drawn therefrom.

The Norman Street apartment had been identified as a result of FBI database searches, including a search of a classified data base, as the most likely current residence of Al–Marabh. Al–Marabh was number 27 on the FBI's Watch List of suspected terrorists or associates of known terrorists. Al–Marabh also had an outstanding warrant for his arrest for assault with a deadly weapon. Further, when the agents arrived at the Norman Street address, they saw Al–Marabh's name on the apartment's mailbox and, although Koubriti said that Al–Marabh did not live there, Koubriti's explanation as to why his name remained on the mailbox did not dispel Agent Thomas's belief that Al–Marabh might be on the premises.

The Court also cannot ignore the context in which the protective sweep took place. This occurred only six days subsequent to the September 11th terrorist attacks on the United States and all law enforcement personnel were on an especially heightened state of alert. As noted, the object of the investigation, Al–Marabh, was not only wanted in connection with violent conduct, but was himself suspected of terrorist-related activities. To have not conducted an initial protective sweep under these circumstances would have been foolhardy, and accordingly, based upon all of these factors, the Court finds the protective sweep entirely justified.

 Furthermore, even if the agents had not immediately swept the apartment, the Court finds that they would inevitably have done so with justification. Agent Thomas testified that when he and Agent Gillette entered the small apartment, the observed Farouk Ali–Haimoud sleeping in the dining/living room area, an area that both agents would inevitably have walked into or through to wait for Koubriti to

locate his identification papers. The agents certainly would have asked Ali-Haimoud to produce his alien registration card, which he did not have in his possession. The agents could have immediately placed him under arrest for violating 8 U.S.C. § 1304(e), and, accordingly, would have been entitled to conducting a search incident to arrest pursuant to *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), entitling them to "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces adjoining the place of arrest." Because the apartment was small in size, the agents would have been justified in looking into the two bedrooms, thereby locating Defendant Hannan and the SkyChef badges which were in plain view on top of the dresser.

For all of the foregoing reasons, the Court finds that the "protective sweep" conducted by the Agents upon entering the premises pursuant to Koubriti's consent was justified. Therefore, the protective sweep provides no basis for exclusion of the evidence of the SkyChef badges observed in plain view by Agent Thomas while conducting the sweep.

## B. THE SEARCH CONDUCTED AFTER THE PROTECTIVE SWEEP WAS CONSENSUAL

Defendants also contend that Defendant Koubriti's consent to the search was not voluntarily given.

■ It is well-settled that the government carries the burden of establishing through "clear and positive testimony" that, absent a search warrant, law enforcement officials obtained a valid consent to search. *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir.), *cert. denied*, 519 U.S. 848, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996). It is undisputed that the fraudulent documents that were seized from the Norman Street residence were not in plain view and there were no demonstrated exigent circumstances. Therefore, the only basis upon which evidence could have been obtained was through a free and voluntary consent to search, which was not "the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Mincey v. Arizona*, 437 U.S. 385, 390–91, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

■ For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. *See United States v. Scott*, 578 F.2d 1186, 1188–89 (6th Cir.1978). "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth, supra* at 248–49, 93 S.Ct. 2041 (footnote omitted). *See also, United States v. Guimond*, 116 F.3d 166, 170–71 (6th Cir.1997).

■ The fact of custody alone is not enough to demonstrate that consent was coerced. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). In *Watson*, the Supreme Court considered the following factors in concluding that a defendant, who after being arrested, voluntarily consented to the search of his car: (1) there was no overt act or threat of force committed against the defendant; (2) there were no promises made or subtle forms of coercion that might flaw the defendant's judgment; (3) the consent was given in public, not in the police station; (4) the defendant was not a "newcomer to the law"; (5) the defendant was not mentally deficient; (6) the record did not indicate that the defendant was unable, while arrested, to exercise a free choice regarding the consent; and (7) the

arresting officers had administered *Miranda* warnings to the defendant prior to the consent. *Id.* at 424–25, 96 S.Ct. at 828–29.

■ Furthermore, even if consent is obtained while a person is illegally detained, it can still be found to be voluntary "provided that the totality of circumstances confirms that the consent was not coerced." *United States v. Boone*, 245 F.3d 352, 362–63 (4th Cir.2001). *See also, United States v. Guimond, supra.*

■ Viewing the totality of the circumstances in this case, the Court finds that the consent obtained from Defendant Koubriti, as well as the verbal consent given by Defendants Hannan and Ali–Haimoud, was voluntarily given. Clearly, there was no coercive or illegal conduct on the part of the agents. The testimony, which the Court finds credible, was undisputed that no agent or officer at any time ever drew a weapon or made any threats or any threatening gestures. Although the three men were handcuffed at the time that Defendant Koubriti was presented with the consent to search form which he signed after having it translated for him, the agents testified that all three men verbally consented to the search. Furthermore, at the time they were handcuffed, the Defendants were told that they were being handcuffed only as a safety precaution. They were allowed to be together, to sit or stand, as they chose, and were allowed to smoke.

The Defendants were further advised, by way of Language Specialist Moaikel's translation of the consent form, that they had a constitutional right to refuse to give consent. Language Specialist Moaikel testified that he went over the form with the Defendants very carefully, both in English and in Arabic. Moreover, the record indicates that Defendant Koubriti understood English, as evidenced by his initial "all

English" conversation with Agent Thomas at the door.

No testimony was adduced at the hearing to contradict these facts, and the Court finds that all witnesses testified consistently and credibly. Accordingly, the Court is satisfied that the Defendants voluntarily consented to the search of the Norman Street residence.

**C. KOUBRITI'S STATEMENTS CONCERNING THE DOCUMENTS WERE NOT MADE IN RESPONSE TO INTERROGATION AND, THEREFORE, MIRANDA IS NOT IMPLICATED.**

■ In order to safeguard the right against self-incrimination, incriminating statements elicited during a custodial interrogation of a suspect generally may not be admitted into evidence without invocation of the defendant's *Miranda* rights. *See Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 2329–30, 147 L.Ed.2d 405 (2000); *Stansbury v. California*, 511 U.S. 318 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994). However, the Government's *Miranda* obligations arise only in the event of a custodial "interrogation." *See Stansbury, supra*, 511 U.S. at 322, 114 S.Ct. at 1528–29; *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir.1998).

■ Thus, in order for *Miranda* to apply, the defendant must either have been actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest, *Salvo, supra,* **and** there must be an "interrogation." In *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court defined "interrogation" in the context of *Miranda* to "extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.,* 446 U.S.

at 302, 100 S.Ct. 1682. However, "interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689. In *United States v. Avery,* 717 F.2d 1020, 1024 (6th Cir.1983), the Sixth Circuit cautioned that factual circumstances are important to determine whether interrogation is present.

Courts have held that, generally, questioning a defendant about biographical information is insufficient to trigger the *Miranda* rule. *See United States v. Clark,* 982 F.2d 965, 968 (6th Cir.1993); *United States v. Avery, supra.* *See also, United States v. Ozuna,* 170 F.3d 654, 657 n. 1 (6th Cir.1999) ("Questions to someone coming into this country about his identity and national origin are equally 'biographical,' and every bit as important to the officer's performance of his duties as are the questions normally asked following a suspect's arrest when he is booked into custody. In neither circumstance is interrogation occurring.")

■■ Likewise, "where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, his statements are admissible despite the absence of *Miranda* warnings." *United States v. Murphy,* 107 F.3d 1199, 1204 (6th Cir.1997).

In *Murphy,* the defendant was charged and convicted on two felon-in-possession-of-a-firearm counts. He was arrested and taken into custody after having fled from police and crashing his mother's car through a chain-link fence and into an apartment building. Murphy had abandoned the car and fled on foot. The police inventoried the contents of the car and found on the passenger seat a .38 caliber revolver and a blue knit ski mask. Murphy was subsequently found at his mother's house and arrested. He was placed in the rear of the police car to await identification by officers who had seen him fleeing the scene of crash. After he had placed been placed in the squad car, defendant voluntarily stated that he had been driving his mother's car and that he did not possess a driver's license.

The identifying officers arrived a few minutes later. They testified that no one else was in the police car with the defendant. When the officers opened the car door to get a good look at him, Murphy spontaneously bragged about having evaded the police. He stated that he knew nothing about the gun and ski mask, though neither officer had mentioned finding those objects.

Murphy sought suppression of the statements he made after being arrested and placed in the police car contending that his statements, in addition to being made without benefit of *Miranda* warnings, were coerced. With respect to coercion Murphy argued that there is an inherent coerciveness of the backseat of a police car and this inherent coerciveness and lack of *Miranda* warning rendered his statements coerced and involuntary.

The Sixth Circuit rejected Murphy's coercion argument out-of-hand, and emphasized that "the critical inquiry in determining the voluntariness of a confession is whether the confession is the product of free and rational choice. The court must look at the totality of the circumstances to determine whether the defendant's will was overborne." *Id.* at 1205. Although the *Murphy* court acknowledged that the defendant may have been of "low intelligence," was in custody and had not been *Mirandized,* it held that these factors alone "form an insufficient basis for concluding that a defendant is incapable of exercising free will." *Id.* at 1206. Therefore, the court concluded that Murphy's statements were not coerced. *Id.See also, United States v. Avery, supra,* 717 F.2d 1020 (defendant's statement inquiring

whether if he made restitution, the charges against him would be dropped, which was made to the police after defendant was arrested, taken into custody, and booked, held not to implicate *Miranda* despite the fact that the defendant was in custody and had asserted his right against self-incrimination because the statement was not the result of any interrogation but rather was spontaneously and voluntarily given); *United States v. Montano*, 613 F.2d 147, 149 (6th Cir.1980) (statement made by defendant after he had been arrested and taken into custody upon overhearing the agents were discussing among themselves the question as to whether the other adults should be placed under arrest to the effect that "They don't know anything about it. Leave them here. It's my stuff," held to constitute volunteered statements not within the purview of the *Miranda* guidelines).

The Sixth Circuit's decision in *United States v. Blackmon*, 1998 WL 109992, 142 F.3d 437 (6th Cir.1998), although unpublished, well illustrates the foregoing principles. Blackmon was detained, along with two other men, by police investigators in Jackson, Tennessee after they had received a tip about narcotics activity in the area where Blackmon and his friends were found. Although the initial frisk of Blackmon yielded nothing suspicious, he was taken into custody when the police discovered that there was an outstanding warrant for his arrest for a parole violation. The arresting officers then took Blackmon to the County Jail. In the booking area of the jail, Blackmon was asked routine biographical questions and he relinquished his personal effects.

While engaged in the booking procedure, one of the officers, Officer Frizzell, received a phone call indicating that one of investigators on the scene believed Blackmon had a gun in his pants, near his crotch. Frizzell then asked Blackmon if had taken everything out of his pockets and if there was anything else he needed to know about, which caused Blackmon to become noticeably uneasy. After another frisk, Blackmon was taken into a side office where his pants were pulled down to his knees. This search too failed to uncover anything. He was then taken upstairs to the jail so that he could change from his street clothes into prison garb. While en route to changing, Blackmon said that he wanted to talk to the two investigating officers who had picked him up on the street. He was told by Frizzell that he had to change into prison clothes first.

Frizzell testified that at this point Blackmon replied, "Okay, I have a gun," and directed the officer to his pants leg, where after lifting up the pant leg, the officer found a gun protruding from Blackmon's high-top tennis shoe. According to Blackmon, when the investigating officers arrived, they asked him how he managed to get the gun into the jail, but that he denied the gun was his. The investigators denied that they asked Blackmon any questions. They stated that Blackmon contended that the gun was not his, but that he was holding it for one of the other men detained on the scene. It was undisputed that no *Miranda* warnings were ever given to Blackmon.

Blackmon moved to suppress the gun and all statements made by him arguing that the evidence was obtained while he was subjected to custodial interrogation and without having been advised of his *Miranda* rights. The District Court denied Blackmon's motion to suppress and the Court of Appeals affirmed, explaining:

> Blackmon asserts that he was interrogated when Frizzell asked him, after being informed that Blackmon might have a gun in his pants near the crotch, if there was "anything else that he had that we needed to know about." Further into Blackmon's booking, Frizzell also asked

him, "is there something you're wanting to tell me?"

Though these were not biographical questions, Frizzell's questions were merely part of a routine booking process. . . . **Blackmon's alleged retort was also voluntary in that it did not immediately follow one of Frizzell's questions but, instead, immediately preceded the need for him to change into a prison uniform. It does not appear, therefore, that his response was compelled by Frizzell's questioning, but rather, was volunteered by Blackmon in expectation of the guns exposure. . . .**

. . . Blackmon also claims that any statements he made to investigators Wray and Smith after the gun was obtained should also be suppressed due to the alleged interrogating by Frizzell before the gun was found. For the reasons discussed above, Frizzell's questions did not merit applying *Miranda* exclusions, and the district court, therefore, properly refused to suppress these later statements as well.

**Blackmon claims that the gun should also be suppressed because it was the product of this alleged interrogation.** Non-testimonial physical evidence proximately derived from a *Miranda* violation may require suppression as "fruit of the poisonous tree." *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1516 (6th Cir.1988). **As stated above, because the *Miranda* exclusionary rule does not apply, the gun was not acquired from any illegally obtained statements. It follows that the district court was correct in denying the motion to suppress the gun.**

1998 WL 109992 at *2–3, 142 F.3d 437 (emphasis added).

█ In this case, Nazih "George" Moaikel testified that after the search had been underway for approximately five minutes, Koubriti told him, without any prompting or questioning whatsoever, that there were false documents in the bedroom. Moaikel immediately related this information to Agent Thomas and then he accompanied Koubriti into the bedroom to show Agent Thomas specifically where the documents were. Once in the bedroom, Koubriti indicated with his head the desk drawer containing the false documents, and Agent Thomas retrieved the documents from the drawer. Moaikel testified that at the same time, Agent Manescu was alongside of a suitcase going through the day planner. Moaikel further testified that, again without being asked, Koubriti volunteered that neither the documents nor the day planner belonged to him; that they belonged to "Jalali."

█ Thus, the undisputed testimony of record establishes that Koubriti's indication that there were false documents in the bedroom and his subsequent statement that the documents did not belong to him, but rather belonged to Jalali, were spontaneously and voluntarily made and were not made in response to any questioning or "interrogation." Therefore, *Miranda*'s prophylactic policies of protecting individuals from compelled or coerced statements through "interrogation" are simply not implicated here. Furthermore, since there was no *Miranda* violation, there similarly is no basis for application of the "fruit of the poisonous tree" doctrine to suppress the documents or the day planner.[9]

**9.** The only other statements made by the Defendants were statements made concerning their nationality, alien registration, and work history. As indicated above, questioning a defendant about such biographical information is insufficient to trigger the *Miranda* rule. *See United States v. Clark, supra; United States v. Avery, supra; United States v. Ozuna, supra.*

## D. *INEVITABLE DISCOVERY*

Even assuming *arguendo* that *Miranda* would bar the admission of Koubriti's statements, the documents and day planner would not necessarily have to be excluded by application of the "inevitable discovery" doctrine.

■ The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *United States v. Kennedy,* 61 F.3d 494 (6th Cir.1995), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). *See also, United States v. Leake,* 95 F.3d 409, 412 (6th Cir.1996); *United States v. Brown,* 69 F.Supp.2d 925, 932–934 (E.D.Mich.1999).

The Sixth Circuit explained the policies and parameters of the inevitable discovery doctrine in *United States v. Kennedy, supra:*

> In approving the inevitable discovery exception, the Supreme Court reasoned that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means... then the deterrence rationale has so little basis that the evidence should be received." [*Nix v. Williams,* 467 U.S. at 444, 104 S.Ct. at 2509.]
>
> Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place. However, if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in

order to ensure the fairness of the trial proceedings. In that situation the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a worse position than it would have occupied without any police misconduct.

*Id.* at 447, 104 S.Ct. at 2511. Therefore, when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Id.* at 448, 104 S.Ct. at 2511.

For the inevitable discovery exception to apply, **it must be demonstrated that the evidence inevitably would have been acquired through lawful means** had the government misconduct not occurred. *Id.* at 444, 104 S.Ct. at 2509; *see Murray v. United States,* 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5. **"The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred."** *United States v. Eng,* 971 F.2d 854, 861 (2d Cir.1992), *cert. denied,* 510 U.S. 1045, 114 S.Ct. 693, 126 L.Ed.2d 660 (1994).

61 F.3d at 497–499 (emphasis added).

Although some circuits have held that the inevitable discovery doctrine applies only when the Government can demonstrate the existence of an entirely indepen-

dent, untainted investigation, the Sixth Circuit has rejected such a narrow approach, and held in *Kennedy* that such an independent investigation is not required:

> [T]he inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* **the existence of an independent, untainted investigation** that inevitably would have uncovered the same evidence *or* **other compelling facts establishing that the disputed evidence inevitably would have been discovered.** *Therefore, we hold that an alternate, independent line of investigation is not required for the inevitable discovery exception to apply.*

*Id.* at 499–500 (some emphasis supplied). *See also, United States v. Leake, supra.*[10]

■■■ Here, the testimony of record clearly demonstrates that the false documents would have been discovered even if Koubriti had not told George Moaikel that there were false documents in the bedroom. Indeed, the testimony establishes that the search, pursuant to Koubriti's signed consent to search was already underway. Before Koubriti said anything to George about the false documents, Agent Manescu had already found and opened the suitcase in the closet and had found the day planner.[11] And, the testimony further establishes that Agent Thomas had already begun to look through the desk in which the false documents were located. Because Agent Thomas was already searching the desk and because the false documents were in one of the desk drawers underneath a couple of video tapes, it is clear that their discovery was inevitable.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion to Suppress Evidence be, and hereby is, DENIED.

---

**10.** In two more recent cases, *United States v. Dice*, 200 F.3d 978 (6th Cir.2000), and *United States v. Haddix*, 239 F.3d 766 (6th Cir.2001) the court apparently ignored the *Kennedy* court's express holding that "an alternative, independent line of investigation is **not** required for the inevitable discovery rule to apply," and instead stated that application of the doctrine required such an independent, untainted investigation. Because there was no separate "independent" investigation in either case, both the *Dice* court and the *Haddix* court refused to apply the inevitable discovery doctrine. Sixth Circuit Rule 206(c) explicitly states, however, that

Reported panel opinions are binding on subsequent panels. Thus, **no subsequent panel overrules a published opinion of a previous panel.** Court *en banc* consideration is required to overrule a published opinion of the court.

Therefore, *Kennedy* still remains the law of the circuit.

**11.** The fact that Agent Manescu had already found the day planner *before* Koubriti made any kind of statement as to what was in the bedroom or who it belonged to establishes that it could not be deemed "fruit of the poisonous tree" of any *Miranda*-less statements.